[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11037

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BRANDON MICHAEL FLEURY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60056-RAR-1

_____

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

WILSON, Circuit Judge:

Defendant-Appellant Brandon Fleury was convicted by a jury in the Southern District of Florida on one count of transmitting interstate threats, in violation of 18 U.S.C. § 875(c) (Count 1), and three counts of cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B) (Counts 2–4). Fleury's convictions stem from posts he made and messages he sent on Instagram, posing as various mass murderers including notorious serial killer Ted Bundy and Nikolas Cruz, the perpetrator of the Marjory Stoneman Douglas High School shooting. Fleury directed these posts and messages to three individuals (Jesse Guttenberg, Alexis Sealy, and Max Schachter referred to in the indictment as Victims 1, 2, and 3, respectively) who lost loved ones in the shooting.

The district court sentenced Fleury to sixty months in prison for each of Counts 1–3, to run concurrently, and six months in prison as to Count 4, to be served consecutively to Counts 1–3. He was also sentenced to three years of supervised release for each count. On appeal, Fleury raises various challenges to the constitutionality of § 2261A(2)(B), the sufficiency of the indictment and evidence, the jury instructions, and the admission of expert testimony.

## BACKGROUND

On February 14, 2018, Nikolas Cruz murdered seventeen students and faculty members at Marjory Stoneman Douglas High

School in Parkland, Florida, using an AR-15 style semi-automatic rifle (MSD shooting). Between December 22, 2018, and January 11, 2019, Brandon Fleury—bearing aliases like nikolas.killed.your.sister, the.douglas.shooter, and Teddykillspeople (referencing Ted Bundy)—sent victims' family members and friends taunting and harassing Instagram messages that they allege put them in fear for their own lives.

The following evidence was adduced at trial. The government's case-in-chief centered on three victims: Max Schachter, Jesse Guttenberg, and Alexis Sealy.[1] Max Schachter's fourteen-year-old son, Alex, was killed in the MSD shooting. Following Alex's murder, Schachter started a scholarship fund in his name and served as an advocate for school safety. In December 2018, Schachter began receiving "very scary messages" on his Instagram account. Examples of the messages he received include: "I killed Alex and it was fun" and "they had their whole lives ahead of them and I f**king stole it from them." While all of these messages were abhorrent, Schachter testified that he was especially frightened by two messages in particular: "I'm your abductor I'm kidnapping you fool" and "With the power of my AR-15, I take your loved ones away from you PERMANENTLY."

---

[1] Count 2 of the indictment encompasses messages directed towards Jesse Guttenberg, Count 3 towards Alexis Sealy, and Count 4 towards Max Schachter. All three victims testified at trial.

Similar messages were sent to Jesse Guttenberg and Alexis Sealy. Jesse's younger sister Jaime was also killed in the MSD shooting. On December 22, 2018, during his senior year of high school, Jesse woke to find a barrage of messages sent to his Instagram account. These messages included "I'm a murderer," and "[t]hey had their whole lives ahead of them and I f**king stole it from them." As with Max Schachter, Jesse received a message that said, "I'm your abductor I'm kidnapping you fool." And a later series of messages included, "With the power of my AR-15 I take your loved ones away from you"; "I'm the monster that killed your family"; and "With the power of my AR-15 you all die." Jesse showed the messages to his parents, who contacted law enforcement. Police consequently maintained a presence outside the Guttenberg home during the 2018 winter break and continued to closely monitor Jesse's movements upon his return to school, which began to "affect [his] personal life and take away from what [he] needed to be doing."

In mid-December 2018, Alexis Sealy also began receiving harassing messages on Instagram. A lot of these messages taunted Alexis about the death of her best friend, Jaime Guttenberg. Like Max Schachter and Jesse Guttenberg, she received messages that said: "With the power of my AR-15 I erased their existence. Your grief is my joy"; "I'm your abductor I'm kidnapping you fool"; and "with the power of my AR-15 I take your loved ones away from you PERMANENTLY."

On December 22, 2018, having sent harassing messages to another MSD survivor, Cameron Kasky, Fleury admitted in a private message that he "took it way too far with [his] trolling."

Law enforcement obtained the IP address associated with the usernames from which the messages were sent, and determined it was assigned to Fleury's home address. In a post-*Miranda* statement, Fleury admitted to having sent the messages at issue and said that the usernames he used were inspired by his attraction to "aggressive people with violent tendencies," such as Nikolas Cruz and Ted Bundy.

A grand jury returned a four-count indictment charging Fleury with interstate transmission of a threat to kidnap, in violation of 18 U.S.C. § 875(c) (Count 1)[2], and interstate cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B) (Counts 2–4). Fleury filed a pre-trial motion to dismiss the cyberstalking counts as facially overbroad under the First Amendment and unconstitutional as applied to his offense conduct, which the government opposed. The district court denied Fleury's motion in a written order, finding the cyberstalking statute neither overbroad nor unconstitutional as applied.

---

[2] The basis for Count 1 was the message Fleury sent from the username "Teddykillspeople" to all three victims that read: "I'm your abductor [smile emoji and applauding emoji]. I'm kidnapping you fool [lock emoji and blowing kiss emoji]."

At trial, the defense did not contest that Fleury sent the messages in question. Instead, the defense contended that Fleury, who is autistic, did not have the requisite intent to be convicted because he did not understand that his actions would cause substantial emotional distress to others. Fleury's father, Patrick, testified that his son had been diagnosed with attention deficit disorder (ADD), attention deficit hyperactivity disorder (ADHD), autism spectrum disorder (ASD), and obsessive compulsive disorder (OCD), and that his son existed "in his own little fantasy world." Dr. Lori Butts, the defense's expert in forensic psychology, testified that she examined Fleury and diagnosed him as suffering from ASD Level 2 without intellectual impairment. She opined that he had difficulty understanding the emotions of others and that he did not understand the emotional impact of his behavior on his victims. Specifically, she testified that Fleury could understand sadness in others but not grief.

In response, the government called Dr. Park Dietz, an expert in forensic psychiatry who evaluated Fleury for eight hours over two days and diagnosed him with ASD Level 1. Dr. Dietz testified that Fleury could appreciate the emotional impact of his messages on his victims and that he intended for the messages to cause anger, grief, and fear. Disagreeing with Dr. Butts, he concluded Fleury "may not have had complete understanding the way most of us would, but . . . he understood enough to know how bad this was." During Dr. Dietz's evaluation, Fleury acknowledged that he was sexually attracted to serial killers and that this attraction "focused

on both the physical attractiveness of the person and also on what they had done." Dr. Dietz testified that he questioned Fleury in some detail about what Fleury found alluring about the serial killers, and Dr. Dietz's understanding of Fleury's response was that "he found it arousing that they were so domineering and had done so much harm to others." Dr. Dietz posited a connection between Fleury's sexual proclivities to taunting and the charged conduct: "he was aroused by the people but also by their bad acts, including victim taunting. And . . . he wanted to be like them, and that's why he chose the persona of Nikolas Cruz or Ted Bundy to present himself to the world in these anonymous communications."

After a five-day trial, the jury convicted Fleury of all four counts. The district court sentenced Fleury to 66 months' imprisonment, to be followed by three years of supervised release. Fleury timely appealed, raising challenges to the constitutionality of 18 U.S.C. § 2261A(2)(B), the jury instructions, the sufficiency of the evidence for intent, the admissibility of Dr. Dietz's expert testimony, and the sufficiency of the indictment. We address each issue in turn.

## DISCUSSION

### I.    Constitutional Challenges to 18 U.S.C. § 2261A(2)(B)

Prior to trial, Fleury moved the district court to dismiss Counts 2–4 of the indictment, contending the cyberstalking statute, 18 U.S.C. § 2261A(2)(B), was facially unconstitutional for being overbroad because it applied to a substantial amount of protected speech and unconstitutional as applied to his conduct under the

First Amendment. The district court denied Fleury's motion, first rejecting his facial overbreadth argument by concluding "the plain language of section 2261A(2)(B) is directed towards conduct, not speech, and the statute does not punish a substantial amount of protected free speech in relation to its plainly legitimate sweep." Regarding Fleury's as-applied challenge, the court found the messages qualified as true threats and thus did not merit protection under the First Amendment. The court noted that Fleury "made numerous comments indicating a serious expression of an intent to commit an act of unlawful violence towards the victims," and that his use of monikers based on notorious mass murderers "communicated to [the victims] that he had an intent to kidnap, kill, or otherwise harm them." The court ultimately concluded that the messages "implied an ongoing intent to commit *future* acts of violence."

At the close of the government's case-in-chief, Fleury moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing the messages he sent were not true threats and thus were subject to First Amendment protection. In response, the government noted that it had presented evidence showing that Fleury sent the threatening and harassing messages anonymously, adopted usernames referencing known serial killers, and drafted a number of the threatening messages in the present tense, which indicated an ongoing threat to the victims. The district court denied Fleury's motion and later denied Fleury's renewed motion at

the close of evidence, concluding that the government had presented sufficient evidence to send all four counts to the jury.

During the charge conference, the district court reiterated that, because the course of conduct underlying Fleury's § 2261A(2)(B) charges was speech, the jury would have to find that his course of conduct included true threats. Accordingly, the court included an instruction for those counts stating: "You may only find the Defendant guilty if his course of conduct included the communication of a true threat."[3]

On appeal, Fleury reasserts his facial overbreadth and as-applied challenges to the constitutionality of 18 U.S.C. § 2261A(2)(B). He contends that the statute is unconstitutionally overbroad because it has a wide-ranging sweep that encompasses protected speech—including a substantial amount of speech on matters of public concern—simply for causing an emotional reaction. Fleury argues that the statute is also unconstitutional as applied to his conduct because it amounts to a content-based restriction, limiting speech on the basis of whether that speech is emotionally distressing. The speech at issue, according to Fleury, was also on a matter of public concern and thus was entitled to special protection.

The government responds that Fleury glosses over critical statutory elements, including criminal intent, in his effort to portray § 2261A(2)(B) as facially unconstitutional. Section 2261A(2)(B)

---

[3] We will discuss the definition of "true threat" given to the jury and the parties' attendant arguments in detail below.

is also not unconstitutional as applied to Fleury's conduct, the government argues, because true threats—like the messages Fleury sent to the victims—are entitled to no First Amendment protection and the messages did not address a matter of public concern.

★       ★       ★

We review both of Fleury's constitutional challenges de novo. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

A. Overbreadth Challenge.

Section 2261A(2)(B) applies to whomever "with the intent to kill, injure, harass, intimidate . . . uses . . . any interactive computer service or electronic communication system of interstate commerce . . . to engage in a course of conduct that" "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress." 18 U.S.C. § 2261A(2)(B). The term "course of conduct" is defined as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2).

A conviction under § 2261A(2)(B) thus requires proof that "(1) the defendant had the requisite intent; (2) the defendant engaged in a course of conduct; (3) the defendant used a facility of interstate commerce; and (4) the defendant's course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress." *United States v. Ackell*, 907 F.3d 67, 72 (1st Cir. 2018) (alterations adopted and internal quotation marks omitted).

A statute is impermissibly overbroad under the First Amendment—and facially unconstitutional—if it prohibits "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The Supreme Court has long recognized that "the overbreadth doctrine is 'strong medicine' and ha[s] employed it with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769 (1982). The burden of establishing overbreadth rests on the party challenging the statute. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

Fleury has not met his burden of demonstrating that § 2261A(2)(B) is unconstitutionally overbroad. His facial challenge fails because it ignores key statutory elements that narrow the conduct it applies to—including, for example, proof that the defendant acted with "intent to kill, injure, harass, [or] intimidate" and evidence that the defendant "engage[d] in a course of conduct" consisting of two or more acts evidencing a continuity of purpose. 18 U.S.C. § 2261A(2)(B). Further, "[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (internal quotation mark omitted). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292–93.

Because § 2261A(2)(B) is not "substantial[ly]" overbroad, we uphold the constitutionality of the statute. *See id.* In doing so we

join every circuit court of appeals that has addressed a facial attack to § 2261A(2)(B). *See United States v. Ackell*, 907 F.3d 67, 73 (1st Cir. 2018) (concluding that § 2261A(2)(B) does not target speech, and therefore is not unconstitutionally overbroad, because even though the statute "could reach highly expressive conduct, it is plain from the statute's text that it covers countless amounts of unprotected conduct"); *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (concluding, under the prior version of the statute, that "[m]ost, if not all, of the statute's legal applications are to conduct that is not protected by the First Amendment" (alteration adopted)); *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014) (rejecting an overbreadth challenge to the prior version of § 2261A(2)(B) and concluding that because the statute "proscribes harassing and intimidating conduct, the statute is not facially invalid").

We find the analysis the First Circuit employed in *Ackell* particularly persuasive. In that case, the defendant was charged and convicted with one count of cyberstalking under Section 2261A(2)(B) in a sextortion case involving a teenager. Defendant Ackell had threatened to send explicit photos of a teenage girl to her family and friends if she did not do what he wanted. Ackell challenged the statute as facially overbroad on appeal. The First Circuit upheld the conviction and dismissed Ackell's overbreadth argument, concluding that the statute does not target speech; rather, it "targets conduct, specifically 'conduct performed with serious criminal intent.'" 907 F.3d at 74. "[W]hile § 2261A(2)(B) could

reach highly expressive conduct," the court explained, "it is plain from the statute's text that it covers countless amounts of unprotected conduct." *Id.* at 73. To demonstrate this point, the court provided examples of unprotected conduct covered under the statute:

> a defendant could send envelopes of unknown white powder to the victim in the mail; he could send the victim nude photographs of herself; he could repeatedly infect the victim's computers with viruses; he could open unwanted on-line dating profiles under the victim's identity; he could take out unwanted loans in the victim's name; or he could arrange every day for deliveries to be made at the victim's home at all hours of the night.

*Id.* Thus, the First Circuit declined to employ the "strong medicine" of overbreadth and strike down Section 2261A(2)(B). So too do we.

## B. As-Applied Challenge.

Fleury's as-applied challenge fares no better than his facial challenge. While it's feasible to think of limited instances in which § 2261A(2)(B) could apply to constitutionally-protected speech, Fleury's case is not one of them. He argues that the statute is unconstitutional as applied to his conduct because (1) his speech concerned a matter of public concern, and (2) the statute impermissibly restricts the content of his speech. Neither argument has merit.

a.  Matter of Public Concern.

"Speech on matters of public concern is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up). Speech is considered to deal with a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" *Id.* at 453 (internal quotation marks and citations omitted). Such speech is afforded greater First Amendment protection than speech on purely private matters because restricting the latter presents "no threat to the free and robust debate of public issues . . . [or] potential interference with a meaningful dialogue of ideas." *Id.* at 452. Whether speech addresses a matter of public or private concern turns on "the content, form, and context" of the speech. *Id.* at 453.

The district court correctly concluded—after considering their content, form, and context—that Fleury's messages address purely private matters. Of course, the MSD shooting itself is a matter of public concern that kick-started a debate on multiple political and social issues, including mental health, gun control, and school safety. However, Fleury's messages did not address any of these topics, attempt to engage in a dialogue concerning these issues, or provide any other relevant information. Instead, as the district court noted, the messages threatened and intimidated the victims by gloating over the death of their loved ones and "focused only on exacerbating the victims' grief—a purely private matter." The

government is correct in stating that "[t]he fact that Fleury's threatening and intimidating messages arose in the wake of a public tragedy does not transform their 'overarching purpose' into constitutionally protected commentary on a matter of public concern." Put simply, restricting the speech at issue presents "no threat to the free and robust debate of public issues [nor] potential interference with a meaningful dialogue of ideas." *Phelps*, 562 U.S. at 452.

  b.  Content-Based Regulation.

We now turn to Fleury's argument that § 2261A(2)(B) unconstitutionally restricts the content of his speech.

Regulations are content based—and subject to strict scrutiny—if they, "by their terms[,] distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id.*

As an initial matter, we agree with Fleury that the application of § 2261A(2)(B) to his speech amounts to a content-based restriction. It is precisely because of the content of his speech—which included threats to kidnap the three victims and to kill them and their other loved ones—that Fleury was investigated, indicted, and, ultimately, convicted. This conclusion does not, however, end our analysis. The district court found that § 2261A(2)(B)—as applied to

Fleury—did not violate the First Amendment because his messages were true threats. We agree with the district court.

The Supreme Court has long recognized certain "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). Among these categories are incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, speech presenting a grave and imminent threat, and true threats. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). Content-based restrictions are permitted when they are confined to these categories of speech. *Id.* In fact, the Supreme Court has recognized that the protection of our tradition of free speech and thought "can still thrive, and even be furthered, by adherence to [these] categories" and restrictions. *Id.* at 718.

The relevant category of speech here is that of true threats. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). The speaker does not have to actually intend to carry out the threat for the statement to constitute a true threat. *Id.* at 359–60. "Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360 (cleaned up).

Fleury made numerous comments that indicated a serious expression of an intent to commit an act of unlawful violence toward each victim. For example, Fleury assumed the alias of one of the nation's most notorious serial killers, Ted Bundy, when he sent messages to all three victims from the username "Teddykillspeople" that he had the intent to kidnap or otherwise harm them. In other messages sent over the course of several days, Fleury characterized himself as Nikolas Cruz, declared himself a "murderer" and threatened that "[w]ith the power of my AR-15, you all die."

The district court correctly noted that "[t]hese messages did more than celebrate the death of the victims' loved ones. Instead, they implied an ongoing intent to commit *future* acts of violence." Take, for instance, the message that Fleury sent all three victims: "I'm your abductor. I'm kidnapping you fool." This message is worded in the present tense and evidences an intent to intimidate and place the recipient of the message in fear of bodily harm or death. *See Black*, 538 U.S. at 360. In fact, Alexis Sealy testified that receiving this message affected her "because this was the first message [she] had received that enforced some kind of action." Further, messages stating "you all die" and expressing an intent to "take your loved ones away" clearly show an intent to harm or kill individuals that are still alive, rather than merely taunting the victims over the lives that had already been lost. Moreover, at least one of the victims, Jesse Guttenberg, was in such fear for his life that his parents requested law enforcement maintain a presence outside the Guttenberg home and monitor Jesse's movements at school.

And law enforcement apparently agreed with the assessment, as they went ahead and provided the protection.

When viewing Fleury's messages within the context of his entire course of conduct—including the sheer number and frequency of the messages[4]—they create the visual of an anonymous, persistent tormenter who desires to harm the victims. This is precisely the type of fear that the "true threats" doctrine is intended to prevent. *See Black,* 538 U.S. at 360 (noting that a prohibition on true threats serves to protect individuals from the fear of violence).

Because we agree with the district court that the messages Fleury sent amount to true threats, they are not afforded protection under the First Amendment. Accordingly, § 2261A(2)(B) is constitutional as applied to Fleury's conduct.

## II.    Sufficiency of the Indictment for § 2261A(2)(B)

Having determined that § 2261A(2)(B) is constitutional both facially and as applied to Fleury's conduct, we turn to Fleury's challenge to the sufficiency of the indictment.

Fleury argues that the indictment was insufficient for his cyberstalking counts under 18 U.S.C. § 2261A(2)(B) because it was

---

[4] When asked about the number of messages she received, Alexis Sealy testified that "[i]t would be about tens, maybe even a hundred messages a night over the span of a few weeks." More specifically, documents in evidence show that, from December 22, 2018, to January 11, 2019, Fleury used thirteen different Instagram accounts to send a total of 168 messages to Jesse Guttenberg, 75 messages to Alexis Sealy, and 58 messages to Max Schachter.

based on the emotional distress his messages caused the victims, not because they were "true threats." The relevant portion of the indictment reads:

> BRANDON MICHAEL FLEURY, did, with the intent to harass and intimidate, use an interactive computer service and electronic communication service and any other facility of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress . . . .

Fleury did not challenge the sufficiency of the indictment in the district court. "When the adequacy of an indictment is challenged for the first time on appeal, this Court must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." *United States v. Gray*, 260 F.3d 1267, 1282 (11th Cir. 2001) (internal quotation mark omitted).

Fleury's unpreserved challenge to his indictment provides no basis for us to vacate his cyberstalking convictions. The indictment tracked the language of the statute, provided Fleury with adequate notice of his charges, and sufficiently charged the offense for which he was convicted. *See id.* An indictment is not insufficient simply because it "might have been drafted with more clarity." *United States v. Poirier*, 321 F.3d 1024, 1029 (11th Cir. 2003). Accordingly, we affirm the district court.

### III.    Sufficiency of the Evidence for Subjective Intent

Having found the indictment sufficient, we now turn to Fleury's challenge to the sufficiency of the evidence for his subjective intent to threaten.

At trial, Fleury moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Fleury argues that the district court erred in denying both his motion and his renewed motion under Rule 29 because the government presented no evidence whatsoever that Fleury—who the government acknowledged did not have the same understanding of emotion as the average person—intended to threaten anyone. There was thus insufficient evidence, he contends, of his subjective intent to transmit interstate threats and cyberstalk, and his convictions should be reversed.

"We review *de novo* a district court's denial of judgment of acquittal on sufficiency of evidence grounds." *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and draw "all reasonable inferences and credibility choices" in its favor. *Id.* "This inquiry does not require that the evidence be inconsistent with 'every reasonable hypothesis except guilt.'" *Id.* Accordingly, we will uphold the denial of judgment of acquittal—and affirm the guilty verdict—if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence of Fleury's subjective intent to threaten. The jury heard from both a defense expert witness, Dr. Butts, and a government expert witness, Dr. Dietz, and they gave conflicting accounts of Fleury's culpability and the effect his ASD had on his ability to comprehend emotions. Specifically, Dr. Dietz concluded that Fleury intended to cause his victims anger, grief, and fear. And, in response to a questionnaire Fleury completed during Dr. Butts's evaluation, Fleury described himself as "a sympathetic person" and maintained that he "can put [himself] in other people's shoes."

After hearing the testimony, the jury was free to determine both experts' credibility as it saw fit. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions"). We decline to invade the province of the jury by reevaluating the experts' credibility and reweighing the evidence on appeal. In fact, it is precisely because "we recognize that 'the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial,' [that] our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial." *Browne*, 505 F.3d at 1253.

Because it is possible that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319, we find sufficient evidence

supported the jury's findings that Fleury had the requisite intent to be convicted of 18 U.S.C. §§ 875(c) and 2261A(2)(B).

## IV.    Admission of Expert Testimony

We next turn to Fleury's contention that the district court erred in allowing the testimony of government expert Dr. Dietz. Because this argument is raised for the first time on appeal, we review only for plain error. *United States v. Clotaire*, 963 F.3d 1288, 1292 (11th Cir. 2020). "To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (per curiam). "[W]e may exercise our discretion to recognize a forfeited error . . . only if the error 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'" *Id.*

Fleury argues that Dr. Dietz's testimony should not have been permitted because it was irrelevant and unfairly prejudicial. According to Fleury, Dr. Dietz was not qualified to opine on how Fleury's ASD affected his mental state because Dr. Dietz is an expert on serial killers, not ASD. Not only was Dr. Dietz's testimony not relevant, Fleury argues, but it was also unfairly prejudicial— Dr. Dietz testified that he was previously involved in the cases of mass murderers like Jeffrey Dahmer and Ted Kaczynski, and in Fleury's view, his testimony forced the jury to equate Fleury with these individuals and any other mass murderer in recent history. Fleury also complains that the government elicited testimony about Fleury's sexual attraction to serial killers and other mass murderers. Fleury argues that the admission of this testimony was

plain error because it resulted in the jury convicting him based on fear of a crime he did not commit.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Only relevant evidence is admissible. Fed. R. Evid. 402. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403.

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The admission of Dr. Dietz's testimony was not plain error. Having undertaken an extensive eight-hour evaluation of Fleury over two days, Dr. Dietz explained that Fleury's attraction to the domineering and taunting characteristics of serial killers motivated him to send the intimidating messages and opined that Fleury could appreciate the impact that his messages had on the recipients. This testimony was thus clearly relevant under Rule 401, and

Fleury does not explain how the government failed to meet its burden under Rule 702. While it is true that Dr. Dietz is not an expert on ASD, he *is* an expert on forensic psychiatry—not solely an expert on mass murderers as Fleury argues on appeal.

Nor did the district court plainly err when it did not sua sponte preclude the government from introducing evidence relating to Fleury's attraction to serial killers. Such evidence helped the jury understand the motive for Fleury's actions, and the court's instructions ensured that the jury could convict Fleury only of the crimes he was charged with. Finding no plain error, we affirm the district court.

## V.    Jury Instructions

Finally, we address Fleury's challenges to the jury instructions.

During the charge conference, the government acknowledged that the speech necessary to convict Fleury of cyberstalking under § 2261A(2)(B) (Counts 2–4) must amount to true threats. Fleury insisted that the district court should require the jury to find that he had the subjective intent to communicate a true threat to convict him on these counts. Pointing out that "the scienter that Congress has defined is intent to harass and intent to intimidate," however, the government argued that proof of Fleury's subjective intent was unnecessary as to these counts. The district court declined to require proof of Fleury's subjective intent to communicate a true threat, concluding that § 2261A(2)(B) already includes

"a scienter element on its very face" and that "adding a subjective true threat to the scienter [would be] a statutory rewrite."

The district court also rejected the use of Fleury's proposed definition of "true threat," and instead chose to track the definition contained in the pattern jury instruction for interstate threats under 18 U.S.C. § 875(c) [5]: "A 'true threat' is a serious threat—not idle talk, a careless remark or something said jokingly—that is made under circumstances that would place a reasonable person in fear of being kidnapped, killed or physically injured."

On appeal, Fleury reasserts his challenges to the cyberstalking and theory of defense instructions. We address each instruction in turn. [6]

A. Cyberstalking Jury Instruction.

"We review jury instructions challenged in the district court *de novo* to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013) (internal quotation mark omitted). "We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are left with

---

[5] 18 U.S.C. § 875(c) provides: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

[6] Fleury does not appeal the jury instruction provided for Count 1, transmitting interstate threats in violation of 18 U.S.C. § 875(c).

a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* (internal quotation mark omitted).

As outlined above, to convict Fleury of cyberstalking the government was required to prove that (1) he had the requisite intent to harass or intimidate; (2) he engaged in a pattern of conduct composed of two or more acts, evidencing a continuity of purpose; (3) he used an electronic communication system of interstate commerce; and (4) his pattern of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress. *See Ackell*, 907 F.3d at 72; *see also* 18 U.S.C. §§ 2261A(2)(B), 2266(2).

The jury instruction the trial judge gave as to § 2261A(2)(B) reads in full as follows:

> It's a Federal crime to knowingly use, with the intent to harass or intimidate, an interactive computer service, electronic communications service, or other facility of interstate or foreign commerce to engage in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress.
>
> The Defendant can be found guilty of this crime only if the following facts are proved beyond a reasonable doubt:
>
> (1)     the Defendant used an interactive computer service, electronic communication service, or

any other facility of interstate and foreign commerce to engage in a course of conduct;

(2)    that the Defendant, while engaged in the course of conduct, acted with the intent to harass or intimidate Victims 1, 2, or 3;

(3)    that the Defendant's course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to Victims 1, 2, or 3.

A "course of conduct" is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. You may consider each communication between the defendant and the victims as a separate act.

Intent to "harass" means to act with the specific intent or purpose of causing an adverse emotional reaction in a specific person, not merely speech that happens to cause annoyance or insult.

Intent to "intimidate" means to act with the specific intent or purpose of putting a person in fear or apprehension of injury inflicted by a particular person.

You may only find the Defendant guilty if his course of conduct included the communication of a true threat. A "true threat" is a serious threat—not idle talk, a careless remark, or something said jokingly—that is made under circumstances that would place a reasonable person in fear of being kidnapped, killed, or physically injured.

"Substantial emotional distress" means significant mental distress, mental suffering or anguish, as well as physical pain. It therefore requires a serious invasion of mental tranquility.

The Supreme Court analyzed the constitutionality of a jury instruction that included a definition of "true threat" in the context of 18 U.S.C. § 875(c) in *Elonis v. United States*, 575 U.S. 723 (2015). Under § 875(c), it is a federal crime to transmit in interstate commerce "any communication containing any threat to kidnap any person or . . . injure the person of another." 18 U.S.C. § 875(c). In *Elonis*, the Court reversed a conviction under § 875(c) when the jury was instructed that:

A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

*Elonis*, 575 U.S. at 731. Because neither the statutory text of § 875(c) nor the jury instruction provided contained a scienter requirement, the Court acknowledged that Elonis's conviction "was premised solely on how his posts would be understood by a reasonable person." *Id.* at 737.

"Such a 'reasonable person' standard," the Court noted, "is inconsistent with 'the conventional requirement for criminal conduct—*awareness* of some wrongdoing.'" *Id.* at 737–38. The Court

found that "Elonis's conviction cannot stand" because "[t]he jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error." *Id.* at 740 ("Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state."). The Court ultimately held that "the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* Criminal negligence is not enough to convict under § 875(c). *Id.*

Because *Elonis* decided the requirements for liability under § 875(c) as a matter of statutory interpretation, it did not reach the defendant's First Amendment challenge to the jury instructions.

⋆     ⋆     ⋆

Fleury asserts on appeal that the cyberstalking—or "interstate stalking"—jury instruction presents an *Elonis* issue. He contends that, after *Elonis*, we should hold that a defendant can be constitutionally convicted of making a true threat *only* if the defendant intended the recipient to feel threatened. The given jury instruction, Fleury argues, does exactly what the Supreme Court held was impermissible in *Elonis*—defines "true threat," and hinges criminal liability, on how a "reasonable person" would view the messages rather than on the subjective intent of the sender of those messages: the defendant.

We find no error in the instruction provided to the jury. The district court properly declined to instruct the jury that the government had to prove Fleury's subjective intent to communicate a true threat to convict him of cyberstalking under 18 U.S.C. § 2261A(2)(B). Fleury relies in vain on *Elonis*, where the Supreme Court read a mens rea requirement into a statute that lacked *any* scienter element—the transmission of interstate threats under 18 U.S.C. § 875(c). No similar problem exists here because the cyberstalking statute required proof that the defendant acted with the intent to harass or intimidate. *See* 18 U.S.C. § 2261A(2).[7]

Because the plain language of § 2261A(2) establishes a mens rea requirement sufficient "to separate wrongful conduct from 'otherwise innocent conduct,'" *Elonis*, 575 U.S. at 736, it was not reversible error for the district court to decline to impose an additional, subjective-intent requirement for the jury to convict Fleury of cyberstalking. The jury was instructed on the mens rea element—subjective intent to harass or intimidate—that Fleury must have had while communicating true threats.[8] The jury found the

---

[7] This was Fleury's proposed jury instruction on mens rea for his 18 U.S.C. § 2261A(2)(B) charges:

> "Intent to harass or intimidate" requires an intent to communicate a true threat. A "true threat" is a statement where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

[8] Notably, the court's jury charge defining the subjective intent to harass or intimidate required the specific intent or purpose of causing an adverse

government proved the requisite mental state beyond a reasonable doubt. Fleury cites no case law for his position that, even when a statute contains an express mental state requirement, the district court should read an additional mens rea requirement into the text, nor does such a position make sense. *See United States v. Bell*, 303 F.3d 1187, 1191 (9th Cir. 2002) (declining to include a specific intent instruction when the instruction already included "the intent to harass," and concluding that "[t]he instructions given were properly tailored to the charged offense and the district court was not obligated to do more"). Accordingly, we affirm the district court as to this issue.

B. <u>Theory of Defense Jury Instruction</u>.

Fleury argues next that the district court erred in modifying his proposed theory of defense jury instruction. We review a refusal to give a requested theory of defense instruction for an abuse of discretion. *United States v. Rutgerson*, 822 F.3d 1223, 1236 (11th Cir. 2016). A refusal to give a requested instruction "will be reversed only if (1) the requested instruction was substantively correct, (2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially

---

reaction in a specific person or of putting a person in fear or apprehension of injury inflicted by a particular person. Thus, in addition to the requirement that the content of the message had to be a true threat, the court charged that Fleury must have had the specific intent to cause an adverse emotional reaction or to cause fear.

impaired the defendant's ability to present an effective defense." *Id.* (internal quotation mark omitted).

As relevant to the resolution of this issue, Fleury proposed the following instruction:

> The First Amendment permits restrictions upon the content of speech in only a few well-defined and narrow classes of speech. The only exception relevant here is for "true threats." "True threats" are statements where the speakers means to communicate a serious expression of intent to commit an act of unlawful violence to a particular individual or group of individuals.
>
> Mr. Fleury contends that his statements were not "true threats" because they were not serious expressions of intent to commit an act of unlawful violence. If you have a reasonable doubt as to whether the Instagram messages were "true threats," you must find Mr. Fleury not guilty.

Over Fleury's objection the district court instead gave the following instruction:

> The First Amendment of the United States Constitution permits restrictions upon the content of speech in only a few well-defined and narrow classes of speech. The only exception relevant here is for "true threats." A "true threat" is a serious threat—not idle talk, a careless remark, or something said jokingly—that is made under circumstances that would place a reasonable person in fear of being kidnapped,

killed, or physically injured. Mr. Fleury contends that his statements were not "true threats." If you have a reasonable doubt as to whether the Instagram messages were "true threats," you must find Mr. Fleury not guilty as to all counts.

Fleury argues that the district court erroneously modified his theory of defense instruction because (1) it was a correct statement of law, as the proposed definition of "true threat" was taken verbatim from *Virgina v. Black*, (2) it was not adequately covered in the jury charge since the district court refused to instruct the jury as to his subjective intent, and (3) the refusal to give the instruction substantially impaired his ability to put forth a defense.

While Fleury is correct that his proposed definition is a correct statement of law, we afford district courts "wide discretion to decide on the style and wording of [an] instruction" so long as it "accurately reflect[s] the law." *United States v. Singer*, 963 F.3d 1144, 1162 (11th Cir. 2020). Accordingly, "[w]e examine the jury charge as a whole, determining whether the entire charge sufficiently instructed the jury about the issues." *Id.* 1162–63 (alterations adopted and internal quotation mark omitted).

Here, the district court acted within its discretion in giving a modified version of Fleury's proposed theory of defense jury instruction. The district court was not required to adopt the precise wording of Fleury's proposed instruction. The district court covered the substance of Fleury's proposed instruction in the theory of defense instruction it gave, and in the jury charge as a whole.

Fleury's proposed definition of "true threats" is *a* correct definition, but it is not the *only* correct definition. In fact, the Supreme Court recognized as much in *Virginia v. Black*. The full sentence in *Black*, from which Fleury omitted key words, reads: "'True threats' *encompass those statements* where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (emphasis added). As such, the Court never stated that the category of true threats is limited to such statements, only that the category "encompass[es]" them. *See id.* And Fleury has not shown that the definition given was an incorrect statement of the law. Further, Fleury isolates parts of the charge and fails to take into account other parts of the charge or the charge as a whole, as discussed below.

Indeed, the substance of the proposed instruction was adequately covered in the charge the district court gave to the jury. Both substantive offense instructions required that the jury consider Fleury's subjective intent. The instruction for 18 U.S.C. § 875(c) required the jury to find that Fleury "sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat," and the instruction for 18 U.S.C. § 2261A(2)(B) required the jury to find that Fleury "acted with the intent to harass or intimidate." The § 2261A(2)(B) instruction further defined "intent to harass" as "to act with the specific intent or purpose of causing an adverse emotional reaction in a specific person, not merely speech that happens to cause annoyance

or insult" and "intent to intimidate" as "to act with the specific intent or purpose of putting a person in fear or apprehension of injury inflicted by a particular person." In *Black*, the Supreme Court found that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." 538 U.S. at 360. Thus, there was no substantial impairment to Fleury's ability to present his theory of defense because the other instructions adequately covered it.

Because the theory of defense instruction the district court gave, coupled with its charge as a whole, adequately "cover[ed] the gist" of Fleury's proposed instruction, and because the failure to give the instruction did not substantially impair Fleury's ability to present an effective defense, the district court did not abuse its discretion and we affirm. *See Rutgerson*, 822 F.3d at 1236.

## CONCLUSION

In conclusion, we hold that 18 U.S.C. § 2261A(2)(B) is both facially constitutional and constitutional as applied to Fleury's conduct. Having found no reversible error on any of the issues Fleury presents on appeal, we affirm the district court's rulings and Fleury's convictions.

**AFFIRMED.**