NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0261n.06

No. 25-5723

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 10, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| v. | ) | |
| THOMAS RUTTER WOOLLACOTT, | ) | |
| Defendant-Appellant. | ) | OPINION |

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

BOGGS, Circuit Judge. In this appeal from a jury verdict, the question is whether sufficient evidence existed to show that a statement threatening a United States Congressman and his staff constituted a true threat and whether the district court committed plain error in defining the required subjective mental state for liability under 18 U.S.C. § 115(a)(1)(B). As set forth below, the statement in question was a true threat and the district court properly instructed the jury. We affirm.

## I.  Factual Background

In March 2024, Thomas Woollacott left an anonymous voicemail at the office of United States Representative Andy Barr in Lexington, Kentucky. In the two-and-a-half-minute message, Woollacott told Congressman Barr and his staff that "you all should quit if you have any f***ing

integrity."[1] He complained about Barr's representation and congressional spending, adding, "You're dead Andy Barr, you worthless, traitorous piece of shit. Vest the f*** up." "Where [are] you . . . going to hide?" He continued, "So now we're going to have to do things the hard way. Vest the f*** up. The Second Amendment's all we got." He stated, "You're all done." "You're all enemies of the state." He warned Congressman Barr that "I don't care what badge asshole you send . . . . You understand, you're all f***ed."

The Congressman's staff testified about their reactions to the message. Intern Chloee McCartney said the message was "very concerning" and "scary" and that she was "nervous for the congressman's safety." She summarized the reaction of another staffer and herself as, "we were pretty scared." Staffer Abe White testified that the voicemail left him "frightened." He took the "vest up" comment to reference putting on a "bulletproof vest because you're going to get bullets your way." Barr's Deputy Chief of Staff, Tatum Dale, said "We were all really rattled when we heard the voicemail." She "took his words seriously" and believed the caller "was capable of hurting us or also hurting the congressman." Chief of Staff Mary Rosado thought that the message was "very alarming" and noted that in her more than ten years in that role she had not heard a message before that caused her as much concern for the Congressman. A copy of the recording was sent to the United States Capitol Police Threat Assessment.

Before the identity of the caller had been ascertained, Woollacott left a second voicemail in April 2024. In this two-minute message, Woollacott again complained about Congressman Barr's representation, saying that Barr was "an enemy of the Constitution," and "we the people will not stand for it." He stated, "It will not be tolerated. You will be hunted and found and

---

[1] *See B.A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 790 n.1 (6th Cir. 2025) on the use of "sanitized expressions."

removed from the face of this f***ing earth." He told Barr that "you can run, but you can't f***ing hide." He stated, "We're coast to coast," and "we'll f***ing find you." He added: "You can hide in your caves, in your tunnels, in your hardened homes. But guess what? All those things need supplies. Every person needs water. Every person needs air." The message ended with Woollacott stating, "You motherf***ers are about to find out. It's over for you. It's over. Vest up."

The staff also testified to their response to the second message. Chloee McCartney said she was scared and this message "sounded more directed toward staff members as well" because the caller talked about "your employer" and "you guys," which she found "definitely more threatening to us as staffers." Abe White said that the second message "increased the feeling of frightfulness." He took the message as "directed to us as staff," and was concerned that the voicemail ended by "saying that we would be hunted down off the face of the earth." He also took the phrase "vest up" to mean that the caller "told me I needed to put a bulletproof vest on to avoid being killed by a bullet." Tatum Dale testified that the staff were concerned because this was a second call from the same person, and the Congressman was in the district at public events, so it would not be difficult for the caller to learn where he was going to be, and they were scared that the caller was going to come to the office. She said that the "threats were pretty clear" that the person "meant harm" and that she was "very concerned" because the voicemail was directed "at the staff and the [C]ongressman." Chief of Staff Mary Rosado called the second message "concerning, threatening" and said it was not "a typical crank call or something." In response, Rosado held regular conference calls about the threats with Congressman Barr and his family and warned other Kentucky congressional offices about Woollacott. Barr's office also hired security for public events.

After the second voicemail, Capitol Police identified the caller as Woollacott, who was already known to them from calls he had made to another congressman. When reached by phone, Woollacott denied making the calls. The Capitol Police then asked the Caldwell County Sheriff's Office to conduct a welfare check on Woollacott. A deputy sheriff met with Woollacott and "asked him if he threatened any public official." Woollacott "replied that he told this person he should wear his vest, ballistic vest." Woollacott added that, "If they felt threatened, then maybe they were guilty."

The Capitol Police decided not to bring charges against Woollacott. Barr's Chief of Staff Rosado expressed frustration with this lack of response "because I didn't think that any reasonable person after listening to these could come away with, 'Wow, this isn't a big deal.'" She then called the House Administration Committee about the situation, and the Louisville Office of the FBI opened a case concerning the messages.

In May 2024, Woollacott was arrested and charged with two counts of threatening a federal official, in violation of 18 U.S.C. §115(a)(1)(B) and (b)(4). Count 1 related to the March message; Count 2 related to the April message. In a post-arrest interview, Woollacott admitted to leaving the voicemails for Barr. Woollacott said that "obviously [the voicemails were] effective in making Andy Barr uncomfortable if you . . . are here." When asked if he would perceive the voicemails as threats if he had received them himself, Woollacott answered, "If I felt I was guilty of abusing the populace, maybe I would." When asked about his use of the phrase, "vest up," Woollacott responded, "It's reality," and "What other f***ing option do we have?"

At trial, Woollacott exercised his right not to testify and presented no proof. But he claimed in opening and closing arguments that the Government had not proven that the messages were criminal threats or that he had acted recklessly as to whether they would be perceived as threatening. The district court denied Woollacott's motion for acquittal after the close of the government's evidence. The district court discussed its proposed instructions with the parties, adjusting the wording until both parties were satisfied and stated that they had no further objections. The district court then issued the final jury instructions, and Woollacott did not object to those instructions.

The jury found Woollacott not guilty of Count 1 (March 23 message) and guilty of Count 2 (April 12 message). The district court imposed a within-guidelines sentence of 30 months of imprisonment and a three-year term of supervised release. Woollacott timely filed this appeal.

## II.     Standard of Review

We review the denial of a motion for a judgment of acquittal *de novo*. *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020). This standard applies where a defendant made a motion for acquittal after the close of the government's evidence and did not put on proof himself. *United States. v. Kubeck*, 487 F.2d 1256, 1258 (6th Cir. 1973); *United States v. Common*, 563 F. App'x 429, 432-33 (6th Cir. 2014). In reviewing the sufficiency of the evidence, we must determine, "after viewing the evidence in the light most favorable to the prosecution," whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ward*, 957 F.3d 691, 695 (6th Cir. 2020). We "must resolve 'all evidentiary conflicts or credibility disputes' in the light most favorable to the jury's guilty verdict." *United States v. Reynolds*, 86 F.4th 332, 338 (6th Cir. 2023) (citation omitted).

When a defendant fails to object to jury instructions, we review a challenge to those jury instructions under the plain-error standard. *United States v. You*, 74 F.4th 378, 391 (6th Cir. 2023) (citing *United States v. Houston*, 792 F.3d 663, 666 (6th Cir. 2015)). Plain error "requires (1) an error, (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Bauer*, 82 F.4th 522, 530 (6th Cir. 2023) (citing *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)). Plain error exists when, "'taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice.'" *Howard*, 947 F.3d at 945 (quoting *United States v. Mahbub*, 818 F.3d 213, 229 (6th Cir. 2016)).

## III.   DISCUSSION

Woollacott makes two arguments on appeal: 1) there was insufficient evidence to prove that the April voicemail message was a true threat, and 2) even if his message was a true threat, the district court committed plain error by failing to instruct the jury on the mental state needed to convict Woollacott under 18 U.S.C. §115(a)(1)(B) and (b)(4).

### A.   Did The Voicemail Message Constitute a True Threat?

Woollacott argues that the government presented insufficient evidence to establish that his April 2024 voicemail was a true threat. (Appellant's Brief at 23). A "true threat" is a statement in which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). A statement can count as a true threat based solely on its objective content. *Counterman v. Colorado*, 600 U.S. 66, 72 (2023). "The relevant question is whether a reasonable observer would take his words to be an authentic threat." *United States v. Doggart*, 906 F.3d

506, 511 (6th Cir. 2018). True threats of violence are not protected by the First Amendment. *Counterman*, 600 U.S. at 72.

Many factors are considered when deciding if a statement is a "true threat," including the words, context, express or conditional nature, and listeners' reactions to the statement. *See Watts v. United States*, 394 U.S. 705, 707–08 (1969) (per curiam); *Howard*, 947 F.3d at 948; *Doggart*, 906 F.3d at 511. In the term "true threat," the word "'true' . . . distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late')." *Counterman*, 600 U.S. at 74 (quoting *Watts*, 394 U.S. at 708). For example, we affirmed a defendant's conviction for leaving a threatening voicemail to a former government official because the statement, "'I'm going to kill you. I am going to murder you[,]' . . . could not have been any clearer in [its] threat." *Howard*, 947 F. 3d at 947–49. Although "a listener's subjective fear alone is not enough to turn an innocuous statement into a true threat," a statement is more likely considered a true threat if the listener is alarmed enough to immediately alert authorities. *Thames v. City of Westland*, 796 F. App'x 251, 262 (6th Cir. 2019)

Here the language and tone of the April 2024 voicemail was sufficient to establish that a rational trier of fact could have found the essential elements of a true threat beyond a reasonable doubt. The voicemail states: "we'll f***ing find you," "[y]ou will be hunted and found and removed from the face of this f***ing earth," "[y]ou motherf***ers are about to find out," "[i]t's over for you," and "[v]est up." When interviewed by the FBI, Woollacott conceded his intention to intimidate, describing the voicemail as "obviously . . . effective" because it was reported to law enforcement.

Woollacott argues that although the message is "ominous" and consists of "scathing criticisms" of Congressman Barr and "hyperbolic doomsaying" about his staff, it does not state "an act of violence that he intends to commit against" them. (Appellant's Brief at 18-19) But taken in context—Woollacott directly called the Congressman's office; the message followed a similarly threatening voicemail left by Woollacott a month earlier; the statement had an ominous, visceral tone; the Congressman's staff perceived the voicemail to be a true threat, called the Capitol Police, warned other congressional offices and hired security; Sheriff's deputies went to Woollacott's house to question him; the FBI initiated an investigation—a reasonable person could conclude, as the staff members did, that Woollacott's message was a true threat.

**B.     Did The District Court Plainly Err in Instructing The Jury on The Intent Needed to Convict Woollacott?**

Although a statement can count as a true threat based solely on its objective content, a criminal conviction for making a true threat requires that a defendant had a subjective understanding of and disregarded a substantial risk that his communication would be viewed as threatening violence. *Counterman*, 600 U.S. at 69. In determining the type of subjective mental state required by the First Amendment in true-threat cases, the Supreme Court has held that of the three types of mens rea—purpose, knowledge, and recklessness—a "mental state of recklessness is sufficient" to establish the subjective intent of the defendant. *Ibid*. Specifically, "[i]n the threats context, [recklessness] means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id*. at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).

Woollacott was convicted for threatening a federal official, in violation of 18 U.S.C. § 115(a)(1)(B). Section 115(a)(1)(B) makes it a crime to threaten to "assault, kidnap, or murder"

a federal official "with intent to impede, intimidate, or interfere with such official . . . while engaged in the performance of official duties, or with intent to retaliate against such official . . . on account of the performance of official duties." 18 U.S.C. § 115(a)(1)(B). Although there are some threat statutes that do not specifically include an intent requirement,[2] § 115(a)(1)(B) does include a mens rea requirement, as do other criminal statutes that Congress has enacted regarding threats.[3]

In *Elonis v. United States*, 575 U.S. 723 (2015), the Supreme Court interpreted a threat statute that was silent on intent, 18 U.S.C. § 875(c), which makes it a crime to transmit in interstate commerce any communication "containing any threat" to injure another person. 575 U.S. at 726. *Elonis* noted that "wrongdoing must be conscious to be criminal," and "[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.'" *Id*. at 734, 736 (first quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952); and then quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)) (cleaned up). *Elonis* held that the mental-state requirement for § 875(c) was satisfied with jury instructions that require a finding that the communication was transmitted for the purpose of issuing a threat or with knowledge that it would be viewed as a threat and might even be satisfied with a recklessness standard. *Id*. at 740.

---

[2] *See, e.g.*, 18 U.S.C. § 2332i(a)(2) (threats of nuclear terrorism); 18 U.S.C. § 873 (blackmail); 18 U.S.C. § 874 (public-works kickbacks); and 18 U.S.C. § 875(c) (threats transmitted in interstate commerce).

[3] *See, e.g.*, 18 U.S.C. § 871(a) (threats against the President "knowingly and willfully"); 18 U.S.C. § 876(c) (mailing threatening communications "knowingly"); 18 U.S.C. § 2261A(2) (stalking "with the intent to kill, injure, harass, [or] intimidate").

After *Elonis*, several sister circuits have held that a subjective-intent jury instruction is required for statutes that have no specific mens rea requirement. *See, e.g.*, *United States v. Mast*, 938 F.3d 973, 975, 977 (8th Cir. 2019) (reading a mens rea requirement into 16 U.S.C. § 668dd(f)(2)); *United States v. Lynch*, 881 F.3d 812, 816 (10th Cir. 2018) (reading a general intent mens rea into 49 U.S.C. § 46504); *but see, e.g.*, *United States v. Wynn*, 827 F.3d 778, 785 (8th Cir. 2016) (finding no error where the instruction did not include intent to threaten a federal employee for § 115(a)(1)(B)); *United States v. White*, 810 F.3d 212, 223 (4th Cir. 2016) ("[I]t would be passing strange, indeed impossible, for a defendant to intend to obtain something by communicating such a threat without also intending, understanding, or, possibly, recklessly disregarding that the communication would be perceived as threatening."); *United States v. Fleury*, 20 F.4th 1353, 1371 (11th Cir. 2021) (finding no *Elonis* error where the cyberstalking statute required intent to harass or intimidate); *United States v. Killen*, 729 F. App'x 703, 711 (11th Cir. 2018) (finding no *Elonis* error where the statute already required intent to extort).

Here, 18 U.S.C. § 115(a)(1)(B) includes two specific-intent provisions. This court has long since "assumed the requirement of specific intent in numerous opinions, both published and unpublished, involving § 115 prosecutions." *United States v. Veach*, 455 F.3d 628, 633 (6th Cir. 2006) (string citation). "Both the actual language of the statute itself and our allusions to the requirements for conviction under that provision lead to the inescapable conclusion that 18 U.S.C. § 115(a)(1)(B) contains a specific intent element that must be proven by the government beyond a reasonable doubt." *Ibid*. The statute requires "that the defendant made such a threat for the specific purpose of interfering with the performance of official duties or of retaliating for the performance of such duties." *Ibid*. In *United States v. Cope*, 283 F. App'x 384 (6th Cir. 2008), we rejected the argument that a defendant can be convicted under § 115(a)(1)(B)

only if a separate finding is made that he intended his statements to be threats. "Surely a defendant who 'intend[s]' a 'threat as an act of retaliation' subjectively 'intends' the threat to be a real one." *Cope*, 283 F. App'x at 388 (alteration in original) (quoting the jury instructions). *See also United States v. Stewart*, 420 F.3d 1007, 1017 (9th Cir. 2005) ("[O]ne cannot have the intent required under section 115(a)(1)(B) without also intending to make the threat."); *United States v. Turner*, 720 F.3d 411, 421–23 (2d Cir. 2013) (holding that the speaker intended to intimidate or retaliate against three federal judges was sufficient to establish a true threat).

Consistent with *Cope*, *Elonis*, and *Counterman*, the district court instructed the jury that, to convict Woollacott, it must find beyond a reasonable doubt that:

1. The Defendant threatened to assault or murder Andy Barr;

2. At the time of the alleged threat, Andy Barr was a United States official, specifically a member of Congress; and

3. The Defendant did so with the intent to impede, intimidate, or interfere with Andy Barr while he was engaged in the performance of his official duties as a Member of Congress, or that the Defendant did so with the intent to retaliate against Andy Barr on account of the performance of his official duties.

In explaining the first element to the jury, the instructions stated:

The Government must prove that the Defendant conveyed that he meant to commit an act of unlawful violence or consciously disregarded a substantial risk that his communication would be viewed as threatening violence.

Woollacott argues that although the third element of the jury instruction addresses subjective intent, the first element of the instruction violates the First Amendment because it fails to require a finding that he was "recklessly aware that . . . his statement would be interpreted as threatening violence." (Reply Brief at 4). He further noted that the jury instructions explain that, for the first element, the government must prove that 1) Woollacott "conveyed that he meant to commit" an act of violence, *or* 2) "consciously disregarded a substantial risk" that his statement

- 11 -

would be viewed as threatening violence. Woollacott argues that this bifurcation allowed the jury to convict him by simply finding that he conveyed to a listener that he intended to commit violence. (Reply Brief at 4).

But even if we assume that the jury found, with regard to the first element, that Woollacott was guilty only because he "conveyed his intent" to commit violence, the jury necessarily found that Woollacott acted with more than recklessness because it had to find that he had the "intent to impede, intimidate, interfere with such official . . . while engaged in the performance of official duties" or the "intent to retaliate against such official." 18 U.S.C. § 115(a)(1)(B). The instruction therefore was not improper.

Woollacott also seems to argue that *Counterman* requires that the term "reckless" be included in the jury instruction. But instructions do not have to include the phrase "recklessly aware" for subjective intent to be found by the jury. *Counterman* specifically defines recklessness in a true-threats case to mean "that the speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Counterman*, 600 U.S. at 69 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)). Here, as explained above, the jury found that Woollacott acted with intent, which is more than recklessness. We therefore conclude that the jury instructions did run afoul of *Counterman*.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.