[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

Nos. 19-14942 & 19-14961

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JEANNE E. GERMEIL,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cr-20769-UU-1

_____

2                    Opinion of the Court                    19-14942
                                                             19-14961

Before JORDAN, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

Dr. Jeanne Germeil was convicted of eleven counts of dispensing opioids without a legitimate medical purpose and outside the usual course of professional practice—basically, of running her South Florida medical practice as a "pill mill," in violation of 21 U.S.C. section 841(a)(1). Between her conviction and sentencing, she fled the country. Because, while on release, she did not show at her sentence hearing as ordered, she was convicted of failure to appear under 18 U.S.C. sections 3146(a)(1) and 3147 and of contempt of court under 18 U.S.C. section 401(3). In total, she was sentenced to 210 months in prison.

On appeal, Dr. Germeil challenges the admissibility of the opinion testimony of the government's medical expert, the rejection of her proposed "good faith" defense jury instruction and her motion for judgment of acquittal, the sufficiency of the evidence to convict her of the drug counts, and the reasonableness of her sentence. We affirm her convictions and sentence.

## FACTUAL BACKGROUND

Drug Enforcement Administration Special Agent Gene Grafenstein investigated Dr. Germeil. He used two confidential sources, Mr. Lebrak Morales Gomez and Ms. Yanexi Hernandez, and two undercover officers, Task Force Officer Danniel Guell and

19-14942　　　　　　　　Opinion of the Court　　　　　　　　　3
19-14961

Special Agent Derek Maxey, to see whether any of them could get Dr. Germeil to prescribe them opioids (such as Oxycodone, Percocet, and Dilaudid) without showing medical necessity. The four would-be patients wore recording equipment during the visits with Dr. Germeil and eventually obtained at least one prescription each. Based on these prescriptions, Agent Grafenstein got a warrant to search Dr. Germeil's office, which he executed. Agent Grafenstein seized Dr. Germeil's patient files and payment logs and found nearly thirty thousand dollars in cash in her purse.

Around the time of the search, Agent Grafenstein spoke with Dr. Germeil. She admitted that she was certified in family medicine, but not in pain management. She gave the basics about her practice: she owned it with her husband Mr. Jean-Rene Foureau; "[s]he handled all the medical aspects" as the only medical member on staff, and he handled the business aspects; he ran searches through Florida's drug monitoring program on all patients, except that she would run them "only if he was not present and only for patients that were [diagnosed with] either chronic pain or [human immunodeficiency virus]." When asked about a typical initial visit, she said that she refused to see anyone without magnetic resonance imaging results, and that she had patients sign in, fill out an intake questionnaire, and wait in the waiting room and had staff take the patients' vital signs before she saw them.

The government's expert witness, Dr. Reuben Hoch, reviewed the footage from the confidential sources and undercover

officers' visits as well as Dr. Germeil's patient files for them and for ten other patients. He concluded that Dr. Germeil did not satisfy the appropriate standard of medical care.

## PROCEDURAL HISTORY

A grand jury indicted Dr. Germeil on sixteen counts of dispensing a controlled substance. Each of the sixteen incidents occurred on different days between March 2016 and November 2017 and involved one of the fourteen patients whose files Dr. Hoch reviewed: each patient, including the undercover officers, participated in exactly one incident, except that the confidential sources were each involved in two.

At trial, the government presented testimony from Agent Grafenstein, Agent Maxey, Officer Guell, Mr. Morales Gomez, Ms. Hernandez, and Dr. Hoch, as well as an intelligence analyst from the Drug Enforcement Administration (to explain the number of pills Dr. Germeil prescribed), someone from the Florida Department of Health (to explain the drug monitoring program), and three of the patients listed in the indictment. The government also introduced into evidence Dr. Germeil's patient files for the confidential sources, undercover officers, and ten other patients, the charged prescriptions that Dr. Germeil wrote them, her payment logs, information about Dr. Germeil queried from the drug monitoring program, the Drug Enforcement Administration analyst's analysis of this information, the Florida regulation governing pain

prescription standards (rule 64B8-9.013), and the footage from the investigation, with transcripts and associated materials.

Agent Grafenstein testified that Dr. Germeil admitted to conducting a physical examination by touching only the area of the body in which the patient claimed pain—and to, "at her prerogative," skipping a physical exam altogether. She told him she did not prescribe physical therapy—or any other therapy—because her practice did not offer it and she was not going to refer her patients to an outside source of treatment. "All she d[id] [wa]s write for pills," Agent Grafenstein said. The patient records recovered during the investigation showed that Dr. Germeil used "boilerplate language . . . in pretty much every office visit for everyone." The payments made to Dr. Germeil during the investigation were "[e]ntirely in cash." Importantly, Agent Grafenstein described how Dr. Germeil prescribed Oxycodone to Officer Guell after Ms. Hernandez introduced Officer Guell to Dr. Germeil as Ms. Hernandez's stepbrother, even though Officer Guell presented Dr. Germeil with the same magnetic resonance imaging results that, a couple of months earlier, Dr. Germeil had inspected to conclude that "there was nothing wrong" with Officer Guell and that she "could not see him" as a patient.

Officer Guell corroborated Agent Grafenstein's testimony and stated that his magnetic resonance imaging results showed "no visible signs or necessity to see the doctor." Officer Guell also said that when he got his prescription Dr. Germeil did a one- or two-

minute physical examination to listen to his breathing and examine his back, "had [him] read the dos and don'ts regarding the controlled substances," and gave him his prescription. He told her he shared Oxycodone pills with his sister, and Dr. Germeil still prescribed him the pills. According to Dr. Germeil's patient file for Officer Guell's undercover persona, the encounter lasted around sixty minutes and she discussed with him "psychotherapy, counseling, behavior" support therapy, his weight, his diet, exercise, and at-home safety precautions. But, according to Officer Guell, the encounter lasted thirteen minutes, and Dr. Germeil did not discuss any of these topics.

Dr. Germeil asked her patients to indicate their pain level on a scale from one to ten, with one being the least amount of pain. Agent Maxey testified that he flagged a pain level of three. Agent Maxey's physical examination lasted less than a minute, he said, and consisted of Dr. Germeil listening to his breathing with a stethoscope and touching his back while asking him where his pain was located. He did not indicate feeling pain when she touched his back, instead reporting that was where the pain was but that it did not hurt when she pushed on it. Agent Maxey did not remember making certain markings on Dr. Germeil's forms that then appeared there: e.g., checking the "Work Accident" box or writing a circle or an "A" for "Aching" on a diagram of the human back. And, although Dr. Germeil's file for his undercover persona stated that during their sixty-minute encounter, they discussed diet, exercise,

19-14942                    Opinion of the Court                    7
19-14961

at-home safety precautions, a diabetes program, possible follow-ups with specialists, and the need for emergency services or hospitalization if his symptoms persisted, Agent Maxey testified that Dr. Germeil did not discuss any of these subjects with him. All in all, he said that he spent at most fifteen minutes—not sixty—with Dr. Germeil before she wrote him an Oxycodone prescription.

Mr. Morales Gomez testified that it was "[n]ot difficult at all" to get a prescription from Dr. Germeil. His physical examination was "[n]o more than two minutes" long, during which Dr. Germeil "grabbed [his] shoulder really quick[ly]." His total visit was "approximately [seventeen] minutes long"—not the around sixty minutes documented in his patient file. He gave his reason for seeing Dr. Germeil as feeling some "discomfort" in his shoulder, and he left a spot on a form blank because he "had no pain." Even though he did not describe his pain during his visit as "strong," Dr. Germeil's patient file for him said that he had been having "strong right shoulder pain since a few years back." Mr. Morales Gomez testified that, although Dr. Germeil noted in his patient file that she recommended a follow-up visit and talked to him about his diet, she did not do either. He added that a year later he got an Oxycodone prescription from Dr. Germeil without her performing a physical examination of him—or anything more than a cursory inquiry into his pain level. Even after Mr. Morales Gomez told her he sold his prescription medications to help a family member in Cuba, she prescribed him more Oxycodone, though she informed

him that he was not supposed to sell it.  Mr. Morales Gomez testi-fied that Dr. Germeil encouraged him to fill his prescriptions after 6:00 p.m. so pharmacists couldn't call her office to "verify" they were "actual prescription[s]."  Mr. Morales Gomez made five visits to Dr. Germeil's office in total, he said, and got a prescription for thirty milligrams of Oxycodone each visit.

Ms. Hernandez testified that when she went to Dr. Ger-meil's office to fill out new-patient paperwork, she intentionally left some information blank, including her pain level on Dr. Germeil's one-to-ten scale.  Yet the paperwork later had a five circled.  When Dr. Germeil saw her, Ms. Hernandez was in no way injured and did not have any pain, but Dr. Germeil wrote her the opioid pre-scriptions she sought.  Dr. Germeil wrote Ms. Hernandez prescrip-tions without giving her a physical examination or asking her about her pain level.  Ms. Hernandez told Dr. Germeil that she sold her pills—her patient file even stated:  "I share [O]xycodone [thirty mil-ligrams]"—but Dr. Germeil did not tell her not to sell her pills or otherwise discharge her as a patient.  Ms. Hernandez saw Dr. Ger-meil eight times and was provided a pain prescription at the end of each visit.  Ms. Hernandez testified that contrary to what her pa-tient file said, each of her visits with Dr. Germeil lasted fifteen minutes maximum, not sixty.  Also contrary to the patient file, Dr. Germeil did not bring up diet or physical therapy as aspects of treat-ment with her, did not discuss at-home safety precautions, did not

advise her to call emergency services or go to the hospital if her symptoms persisted, and did not tell her to take a drug test.

Dr. Hoch testified that rule 64B8-9.013 and associated regulations provided the standard of care in Florida for doctors prescribing opioids. He described the four-step process that a doctor should take in treating a patient claiming pain: (1) review the patient's subjective complaint, (2) conduct a physical examination and other appropriate tests (such as magnetic resonance imaging, x-ray, and blood tests) to obtain objective findings, (3) diagnose the condition responsible for the pain, and (4) devise a "multifaceted" plan, of which "[m]edications are only one aspect," to treat the pain and the "human being as a whole." Dr. Hoch explained that Florida required doctors to keep "comprehensive" patient files so that, when necessary, doctors could defend their medical decisions as legitimate and facilitate the transfer of information. Dr. Hoch testified that he "couldn't really tell what was going on" in the charged patient interactions because Dr. Germeil failed to keep proper medical records. For example, as to a December 9, 2015 patient visit, Dr. Hoch "need[ed] a little bit more information regarding how [the patient's] shoulder pain occurred to understand why [the patient was] given an opioid at all." Dr. Hoch also stated that Dr. Germeil conducted "[v]ery sparse," "not targeted," "very weak and lame attempt[s] at a physical examination," and that her "templated records" were "very weak attempt[s] at a template." Dr. Hoch concluded that for each of the counts, Dr. Germeil failed to

meet the standard of care and prescribed controlled substances without a legitimate medical purpose.

The Drug Enforcement Administration intelligence analyst, Ms. Monica Carter, testified that, from February 2016 through September 2017, Dr. Germeil wrote 7,623 Oxycodone prescriptions, yielding a total of 786,807 pills; 2,915 Percocet prescriptions, yielding a total of 306,294 pills; and 3,221 Dilaudid prescriptions, yielding a total of 365,626 pills. Dr. Hoch called this quantity of pills— "almost 1.5 million" in a nineteen- or twenty-month period—"a staggeringly high amount of medication." Along similar lines, Dr. Hoch testified that, of the "thousands of patients" he treated in his twenty-five years as a doctor, fewer than five percent received "[thirty] milligrams of Oxycodone or stronger" on their first visit. But many prescriptions that Dr. Germeil wrote were for thirty milligrams of Oxycodone or stronger.

After the government rested, Dr. Germeil moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29(a). Dr. Germeil contended that the government presented "no reliable evidence that [she] prescribed to the[] patients without medical necessity." She maintained that the patients "had real injuries" and received pain prescriptions from licensed doctors both before and after she treated them and that Dr. Hoch based his conclusion that she was guilty of prescribing without medical necessity solely on her "inadequate notetaking and file keeping." The district court denied the motion because the government had presented direct evidence

together with "very powerful" circumstantial evidence that Dr. Germeil wrote medically unnecessary pain prescriptions.

In her defense, Dr. Germeil called her husband and business partner Mr. Foureau, one patient listed in the indictment, a patient turned employee, and four other patients. The defense also admitted thirty-eight letters from Dr. Germeil's practice discharging patients who lied and seemed to be "doctor shopping" for pain pills, Dr. Germeil's curriculum vitae and educational record, pictures of her medical office, a lab order for Mr. Morales Gomez, a patient form and magnetic resonance imaging results for Officer Guell, and Agent Maxey's patient file.

After Dr. Germeil rested, she renewed her motion for judgment of acquittal, arguing the government did not prove her guilt beyond a reasonable doubt because there was "no reason to believe that she did not have good faith in prescribing to the[] patients." The district court denied the motion. It said that Dr. Germeil would "have to convince the jury."

Dr. Germeil asked the district court to instruct the jury on the good faith defense. The government opposed this request. The district court sided with the government, deciding not to give the instruction because the good faith defense was already "adequately covered by the jury instructions." The district court explained that the instructions "make it clear that in evaluating whether she did it knowingly, [the jurors] have to take into consideration the standards of medical practice, which is really what this

is all about, whether or not she was knowingly deviating in a criminal way from the standards of practice."

The district court instructed the jury that Dr. Germeil could be found guilty under section 841(a)(1) if the government proved beyond a reasonable doubt:

> [1] that the defendant distributed or dispensed a controlled substance as charged in the indictment; [2] that the defendant acted knowingly and intentionally; and [3] that the defendant's actions were not for legitimate medical purposes in the usual course of her medical practice or were beyond the bounds of medical practice.

The district court stressed that Dr. Germeil was "not on trial for medical malpractice and is not charged with acting negligently with respect to the care of her patients. Again, she is charged with knowingly and intentionally prescribing controlled substances to her patients outside the usual course of professional medical practice." The district court defined "knowingly" as something done "not because of a mistake."

On January 31, 2019, the jury found Dr. Germeil guilty of eleven of the sixteen counts: the six counts involving the confidential sources and undercover officers and five counts involving other patients. The district court allowed Dr. Germeil to remain out on

bond provided her passport stayed with probation and she kept wearing an ankle monitor.

In late March, Dr. Germeil cut off her ankle monitor and fled. The next day, the magistrate judge issued a warrant for her arrest. In response, Dr. Germeil emailed a major South Florida newspaper: "They will get my corpse. I will not obey an unjust and racist system!" When Dr. Germeil failed to appear at her sentence hearing, the district court declared her a fugitive.

Dr. Germeil was arrested in Haiti in July. She pleaded guilty, without a plea agreement, to failure to appear and contempt of court. That case was consolidated with her drug case.

During the sentencing phase, probation calculated the relevant drug quantity by including all opioid prescriptions Dr. Germeil wrote to the patients listed in her counts of conviction—not just the prescriptions listed in the counts. Dr. Germeil objected, arguing that methodology "vastly overstate[d] the drug quantities attributable to [her]." She argued that the district court should only consider the eleven office visits of conviction for purposes of drug quantity because the facts did not support that "every single prescription written . . . had no legitimate medical purpose or was outside the usual course of professional practice." Limiting the relevant conduct to only "the office visits of conviction," Dr. Germeil stated, would yield a base offense level of twenty-four. Dr. Germeil also objected to what she characterized as duplicative penalties for her flight.

In the final presentence investigation report, probation calculated Dr. Germeil's adjusted offense level at thirty-seven, her criminal history category at I, and a guideline range of 210 to 262 months' imprisonment. At the sentence hearing, the district court overruled Dr. Germeil's objections and accepted probation's drug quantity and guideline calculation. The district court explained that, even if Dr. Germeil's patients were in real pain, she did not treat their pain in a medically legitimate way.

Dr. Germeil "ask[ed] for a downward variance to 120 months." She emphasized her husband's great influence over her major decisions: for example, he encouraged her to flee the country. She admitted that it was "probably not a good idea" that she relied on her own continuing education and "never worked for a pain doctor." And she claimed that "she was not just a pill-mill doctor"; she was a real doctor and "a human being who made mistakes, who was extremely, heavily influenced by another individual."

The district court imposed 210 months' imprisonment. As to the drug counts, the district court sentenced Dr. Germeil to 188 months in prison for each count, to run concurrently. As to the failure to appear and contempt of court counts, the district court sentenced her to twenty-two months in prison, to run consecutively to the drug counts as required by statute, *see* 18 U.S.C. § 3146(b)(2), for a total term of imprisonment of 210 months. The district court said that it considered the guidelines, the parties'

19-14942                Opinion of the Court                15
19-14961

arguments, the extent to which there was "a grouping issue" (i.e., the duplicative penalties for flight), and "the statutory factors set forth in 18 U.S.C. [section] 3553(a)." The government asked the district court to make a *Keene*[1] finding that it would impose the same sentence regardless of any miscalculations with the guideline range, and the district court made that finding.

Dr. Germeil appeals her drug convictions and her total term of imprisonment.

## DISCUSSION

Dr. Germeil argues that the district court erred in admitting Dr. Hoch's expert opinion testimony, that the district court erred in rejecting her proposed "good faith" jury instruction and motion for judgment of acquittal premised on good faith in light of a recent Supreme Court decision, that there was insufficient evidence to convict her of the drug counts, and that the district court imposed an unreasonable sentence. We address these issues in turn.

### Admissibility of Expert Testimony

Dr. Germeil contends that the district court reversibly erred when it allowed Dr. Hoch to base opinions about all her patients on his review of only ten random patient files and to opine, without considering the totality of the circumstances, on the

---

[1] *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006).

appropriateness of her prescriptions. She asserts that the sample size of ten "was not an appropriate number of patient files to sample" and "not representative of [her] entire practice," that Dr. Hoch "never dealt with the culture and community in which [she] practiced," and that both these errors made his testimony misleading and confusing.

Because Dr. Germeil did not present these arguments to the district court, we review the admissibility of Dr. Hoch's testimony for plain error. *See United States v. Gonzalez*, 834 F.3d 1206, 1217–18 (11th Cir. 2016) (explaining that when the defendant raises an issue for the first time on appeal, we review for plain error). "We may correct a plain error only when (1) an error has occurred, (2) the error was plain, . . . (3) the error affected substantial rights[, and] . . . (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1218 (alteration adopted and quotation omitted).

Expert testimony is admissible if (1) the expert is qualified to give competent testimony on the testified-to subjects, (2) the expert uses a sufficiently reliable methodology to reach his conclusions, and (3) the testimony helps the factfinder understand the evidence or determine a fact at issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citing Fed. R. Evid. 702). We will not reverse the district court's admission of expert testimony unless the decision is "manifestly erroneous." *Id.* at 1258.

Dr. Germeil challenges only the reliability of Dr. Hoch's methodology. An expert's methodology is sufficiently reliable if it is valid and properly applicable to the facts at issue. *Id.* at 1261–62. Factors we consider in the reliability analysis include, but are not limited to: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262 (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

Dr. Hoch described his methodology as "review[ing] the audio / video" footage from the investigation and the files of the relevant patients, "correlat[ing] [the footage] to what was documented in the patient files," "draw[ing] . . . inferences from what [he] saw on th[e] videos into how Dr. Germeil practiced medicine," "extrapolat[ing] [from the footage through the inferences] to the ten patient files," and assessing the "notations and documentation" of the patient files against the Florida "regulations that physicians are supposed to follow regarding the administration of opioid medications for patients suffering with chronic pain." Using this methodology, Dr. Hoch concluded that Dr. Germeil did not meet the standard of care embodied by those regulations "in what was reflected on the[] patient files" and that "independently, what [he] saw, was [not] consistent with the Florida standard of care." Dr.

Hoch did not review footage relating to the ten random patients because no such footage existed.

Dr. Hoch "grounded his opinions in" Florida's health regulations (a text accepted by the medical community), "described standards of care drawn from" those regulations, and "analyzed Dr. [Germeil]'s conduct"—with which he was familiar through her patient files and the footage—"under those standards." *United States v. Azmat*, 805 F.3d 1018, 1042 (11th Cir. 2015) (emphasis omitted). This straightforward methodology "was sufficiently reliable." *Id.* at 1043.

Dr. Germeil argues that Dr. Hoch could not generalize from such a small sample of patients to all her patients. But he did not do so. Nor did he have to in order to support her convictions. She was not convicted of dispensing controlled substances without medical necessity every time she prescribed any opioid to any patient. She was convicted for specific prescriptions made to specific patients on specific days. Dr. Hoch reviewed the recordings for the visits by the confidential sources and undercover officers, and he reviewed Dr. Germeil's files for the sources, the officers, and the ten other patients. When asked whether Dr. Germeil observed the Florida standard of care "in those instances," he stated that "[s]he did not." And when defense counsel asked if Dr. Hoch was "perfectly willing to accuse Dr. Germeil of prescribing medically unnecessary prescriptions" even though he was not privy to the patients' visits with her, Dr. Hoch made it clear that he was "not accusing"

but "just making an observation of what [he] saw as a physician looking at medical documents[ and] audio / video[ footage] where [he] did see interactions between Dr. Germeil and supposed patients, and [those records] did not represent an adequate medical consult or visit with a patient."

Dr. Germeil also contends that Dr. Hoch disregarded the totality of the circumstances of her visits with patients, including the culture and community of her medical practice. At heart, she argues that Dr. Hoch's testimony was inadmissible because "he had not met with and did not have a doctor / patient relationship with" her patients. This argument really challenges "the accuracy of [Dr. Hoch's] results, not the general scientific validity of his methods," and is thus fodder for cross-examination. *Quiet Tech.*, 326 F.3d at 1345. In fact, when Dr. Germeil cross-examined Dr. Hoch about the ten patient files, she repeatedly brought up the undisputed fact that he did not meet with her patients himself, and she pointed out that he lacked access to the patients' discussions with her about their pain history and didn't know the patients' treatment outcomes. The jury heard this cross-examination and apparently ascribed little weight to Dr. Hoch's lack of firsthand knowledge of Dr. Germeil's patient visits, as was its prerogative. *See United States v. Lankford*, 955 F.2d 1545, 1553 (11th Cir. 1992) ("The weight to be given to expert testimony is within the province of the jury.").

Because Dr. Hoch's methodology was reliable, and Dr. Germeil does not challenge his qualifications or helpfulness to the jury, we discern no abuse of discretion. *See Frazier*, 387 F.3d at 1260. The district court did not err at all, let alone plainly err, when it allowed Dr. Hoch to testify as an expert. *See Gonzalez*, 834 F.3d at 1218 ("We may correct a plain error only when . . . an error has occurred . . . .").

*Good Faith Defense Jury Instruction and Motion for Acquittal*

Dr. Germeil argues that, in light of the Supreme Court's recent decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022), the district court erred in its treatment of the good faith defense.

In *Ruan*, two doctors went to trial for dispensing controlled substances in violation of section 841(a)(1). 966 F.3d 1101, 1120 (11th Cir. 2020). They proposed a good faith defense jury instruction, requiring the government to prove they subjectively knew their prescriptions were unauthorized—that is, not issued for a legitimate medical purpose in the usual course of professional practice. *Id.* at 1165–67. The district court rejected the instruction, and the defendants were convicted. *Id.* at 1119–20, 1166.

We affirmed, concluding that a doctor's subjective (but objectively incorrect) belief that a prescription was authorized wasn't a complete defense under section 841(a)(1). *Id.* at 1166–67. The Supreme Court disagreed and vacated our decision. 142 S. Ct. 2370. The Supreme Court held that the government must prove

beyond a reasonable doubt that a doctor *knew* or *intended* that a prescription was unauthorized. *Id.*

We ordered Dr. Germeil to brief the effect of this Supreme Court decision on her appeal, and she raised two issues. She contends that the district court erred by (1) rejecting her proposed good faith jury instruction, and (2) denying her motion for judgment of acquittal based on the good faith defense. Dr. Germeil doesn't appeal or otherwise argue that the jury instructions the district court *actually gave* were incorrect under the Supreme Court's new decision—she only argues the district court erred in *refusing to give* her proposed instruction.

In contrast, after *Ruan* was remanded, the defendants briefed the issue of "whether the mens rea jury instruction used . . . was error." 56 F.4th 1291, 1295 (11th Cir. 2023). We held it was and vacated the defendants' section 841(a)(1) convictions because the instructions hadn't conveyed that "the defendants must have 'knowingly or intentionally' prescribed outside the usual course of their professional practices." *Id.* at *3.

But, unlike the *Ruan* defendants, Dr. Germeil doesn't argue the district court's jury instructions misstated the law. That argument would've failed had she made it. The district court expressly understood that this case was "all about" whether Dr. Germeil "*knowingly* deviat[ed] in a criminal way from the standards of practice," and it fashioned the instructions to reflect that subjective standard.

When, as here, a defendant only challenges the *rejection* of a proposed jury instruction, we apply the "deferential" abuse of discretion standard. *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012) (quotation omitted). "A trial court enjoys broad discretion to formulate jury instructions provided those instructions are correct statements of law." *Id.*

A district court abuses its discretion by rejecting a proposed instruction only when the instruction "(1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Jockisch*, 857 F.3d 1122, 1126 (11th Cir. 2017) (quotation omitted). A district court may properly refuse to give an instruction that fails any of these prongs. *See id.*

Here, the district court found that the second prong wasn't met because the proposed good faith language was "adequately covered" by other instructions. District courts may reject proposed instructions when "the gist" of the proposal is already conveyed by the district court's charge. *United States v. Fleury*, 20 F.4th 1353, 1372 (11th Cir. 2021). In assessing whether the gist of a rejected instruction was conveyed, "we examine the jury charge as a whole" and "afford district courts wide discretion to decide on the style and wording of an instruction so long as it accurately reflects the law." *Id.* at 1373 (cleaned up). District courts are "not required to adopt the precise wording of [the defendant's] proposed instruction." *Id.*

19-14942                  Opinion of the Court                        23
19-14961

Dr. Germeil's proposed good faith instruction said:

> Good faith is a complete defense to the charges in Counts 1 through 16 of the indictment since good faith on the part of the Defendant is inconsistent with the essential element of knowledge or intent to issue a prescription not for a legitimate medical purpose. Good faith means good intentions and the honest exercise of good professional judgment as to a patient's medical needs. It is an honest effort on the physician's part to prescribe controlled substances in compliance with an accepted standard of medical practice. . . .
>
>      . . . .
>
> I caution you that the Defendant is not on trial in this case for medical malpractice or negligence, neither of which constitutes a crime. . . . Instead, in order to find the Defendant guilty, you must find that at the time she issued a prescription, she did so with knowledge that it was not being issued for a legitimate medical purpose in the usual course of her professional practice.

Although the district court didn't relay "the precise wording" of this instruction, it effectively conveyed the gist. *Id.* The district court told the jury that it needed to find three elements to find Dr. Germeil guilty of a section 841(a)(1) offense.

> First, that the defendant distributed or dispensed a controlled substance as charged in the indictment; second, that the defendant acted knowingly and intentionally; and third, that the defendant's actions were not for legitimate medical purposes in the usual course of her medical practice or were beyond the bounds of medical practice.

Unlike the *Ruan* jury instructions, there's no language in these elements that "[g]ramatically . . . links" the second element (knowledge and intent) to the first element (distribution or dispensation) but not the third element (authorization). 56 F.4th at 1297 ("Grammatically, the 'did so' phrase links the mens rea element to the preceding element describing the actus reus of dispensing the controlled substance, but not to the 'except as authorized' exception."); *see also United States v. Cochran*, 683 F.3d 1314, 1320 (11th Cir. 2012) ("[A]lthough the wording of the final sentence of the . . . instruction would have been more clear if it included language about knowledge or intent, that flaw is mitigated by the totality of the instructions.").

After reciting these elements, the district court stressed that Dr. Germeil was "not on trial for medical malpractice and is not charged with acting negligently with respect to the care of her patients. Again, she is charged with *knowingly and intentionally* prescribing controlled substances to her patients outside the usual

course of professional medical practice."[2]  The district court defined "knowingly" as an act done "not because of a mistake."  Even assuming parts of the proposed good faith instruction better conveyed that Dr. Germeil must've known or intended that the prescriptions were unauthorized, that alone doesn't establish that the district court abused its "wide discretion to decide on the style and wording of an instruction."  See Fleury, 20 F.4th at 1373 (cleaned up).

The district court didn't abuse its discretion by rejecting Dr. Germeil's proposed good faith instruction because it instructed that a conviction required Dr. Germeil to act "knowingly," and we've held, repeatedly, that the good faith defense is "substantially included in the instruction that the criminal act must be done 'knowingly.'"  United States v. Jordan, 582 F.3d 1239, 1248 (11th Cir. 2009); see also United States v. McNair, 605 F.3d 1152, 1201 n.65 (11th Cir. 2010) (explaining that a "knowingly" finding "necessarily excludes a finding of good faith").  Because of the district court's "knowingly" instruction, "the jury plainly had to rule out

---

[2] The *Ruan* district court refused to give an instruction like this one "distinguishing the civil standard of care from the criminal standard."  966 F.3d at 1169.  The Supreme Court's opinion emphasized that this distinction is crucial because negligence is judged by "an objective standard" but section 841(a)(1) as a criminal statute requires a "subjective mens rea."  56 F.4th at 1296 ("The [Supreme] Court held that an objective standard would inappropriately import a civil negligence standard into a criminal prosecution.  Instead, what matters is the defendant's subjective mens rea").

the possibility that [Dr. Germeil] actually harbored a good-faith be-
lief in the legitimacy of" her prescriptions before it could convict.
*See United States v. Martinelli*, 454 F.3d 1300, 1316 (11th Cir. 2006).
"In other words, based on the instructions the district judge gave,
if the jury concluded that [Dr. Germeil] had a good-faith belief in
the legitimacy of the [prescriptions], it could not have found" she
acted knowingly.  *See id.*

Examining "the jury charge as a whole," we conclude that
"the substance of the proposed instruction was adequately cov-
ered."  *Fleury*, 20 F.4th at 1373 (cleaned up).  This was why the
district court rejected the proposed instruction, and under our "def-
erential" standard of review we're unconvinced that was an abuse
of the district court's "broad discretion to formulate jury instruc-
tions."  *Lebowitz*, 676 F.3d at 1014 (quotation omitted).

The district court likewise didn't err by denying Dr. Ger-
meil's motion for judgment of acquittal.  "We review a denial of a
motion for judgment of acquittal de novo."  *United States v. Mau-
rya*, 25 F.4th 829, 841 (11th Cir. 2022).  A district court's denial of a
motion for judgment of acquittal must be upheld if "a reasonable
trier of fact could conclude that the evidence establishes the de-
fendant's guilt beyond a reasonable doubt."  *United States v. Rodri-
guez*, 218 F.3d 1243, 1244 (11th Cir. 2000).

Dr. Germeil argues that had the district court applied the
law as set forth in *Ruan*, her motion would've been granted.  But
the record suggests that the district court *did* apply the law

consistent with *Ruan*. Again, the district court told the parties that the question at the heart of the case was "all about" whether Dr. Germeil "*knowingly* deviat[ed] in a criminal way from the standards of practice." And in denying the motion for judgment of acquittal, the district court ruled that a reasonable jury could find that she did. That ruling accords with *Ruan*, which explained that the government "can prove knowledge of a lack of authorization through circumstantial evidence" as well as evidence showing unreasonable beliefs or misunderstandings. 142 S. Ct. at 2382.

The government introduced extensive evidence from which a reasonable jury could find that Dr. Germeil knew and intended to write prescriptions that weren't for legitimate medical purposes in the usual course of professional practice. Take Ms. Hernandez. She left her pain level blank on her form and had neither pain nor injury. Dr. Germeil knew Ms. Hernandez sold pills because Ms. Hernandez told her as much, and Ms. Hernandez's patient file noted she shared Oxycodone pills with others. Yet, each time Ms. Hernandez met with Dr. Germeil, eight times in all, she left with an opiate prescription. This type of evidence provided ample reason to deny the motion for judgment of acquittal.

### Sufficiency of the Evidence

Dr. Germeil contends that the evidence presented at trial was insufficient to establish that she dispensed controlled substances without medical necessity. Aside from arguing that she is innocent of the drug charges, Dr. Germeil contends that the

government "failed to properly establish an applicable threshold standard of medical care by which the jury could measure [her] conduct," and that, in fact, because "the difference between civil malpractice and criminal conduct is a matter of degree," "a clearly articulated criminal standard . . . [wa]s not possible" in this case. She says that although the government "presented expert medical testimony regarding acceptable medical standards and whether [her] conduct was outside [their] bounds," the jury lacked evidence of a generally accepted standard of medical practice to guide their deliberations over whether she violated that standard.

"We review the sufficiency of the evidence de novo when, as here, the defendant has preserved h[er] claim by moving for a judgment of acquittal." *Azmat*, 805 F.3d at 1035 (emphasis omitted). We view the evidence and all reasonable inferences and credibility choices in the light most favorable to the government. *Id.* We must affirm the conviction "unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quotation omitted).

It is a crime "for any person knowingly or intentionally . . . to . . . dispense . . . a controlled substance," 21 U.S.C. § 841(a)(1), such as Oxycodone, Percocet, and the hydromorphone in Dilaudid pills, 21 C.F.R. §§ 1308.12(b)(1)(vii), (xiv). But, as explained, "an individual [medical] practitioner acting in the usual course of h[er] professional practice" may prescribe a controlled substance "for a

legitimate medical purpose." *Id.* § 1306.04(a). "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . ." *Id.* A person who issues a prescription outside "the usual course of professional treatment . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.* A party may establish the applicable standard of care for this inquiry through the opinion testimony of a medical expert. *See, e.g.*, *United States v. Joseph*, 709 F.3d 1082, 1103–04 (11th Cir. 2013).

The jury had sufficient evidence of the standard of medical care from Dr. Hoch's testimony and from the Florida rule setting standards for prescribing opioids, which the government submitted into evidence.

Dr. Hoch concluded that Dr. Germeil did not meet the standard of care in any of the charged patient interactions and that she prescribed the charged controlled substances without a legitimate medical purpose. The jury was free to credit as much of Dr. Hoch's testimony as it considered appropriate. *See United States v. Westry*, 524 F.3d 1198, 1214 (11th Cir. 2008) ("[I]t is not for us to re-weigh the factfinder's credibility choices."). Here, this testimony was sufficient by itself to support Dr. Germeil's drug convictions.

The jury also had enough information to find for itself that Dr. Germeil did not meet the standard of care. The rule submitted into evidence gave seven sets of standards for using controlled

substances to treat pain, including patient evaluation and medical record standards. *See* Fla. Admin. Code Ann. r. 64B8-9.013(3) (2010). The patient evaluation standards required the prescribing medical practitioner to conduct "[a] complete medical history and physical examination" and to document the results, along with "the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, . . . history of substance abuse," and "the presence of one or more recognized medical indications for the use of a controlled substance," in the patient's medical record. *Id.* r. 64B8-9.013(3)(a). Likewise, the medical records standards "required" the doctor "to keep accurate and complete records" of, at least, "[t]he complete medical history and a physical examination, including history of drug abuse or dependence, as appropriate," "[d]iagnostic, therapeutic, and laboratory results," "[e]valuations and consultations," "[t]reatment objectives," "[d]iscussion of risks and benefits," "[t]reatments," "[m]edications (including date, type, dosage, and quantity prescribed)," "[i]nstructions and agreements," "[d]rug testing results," and "[p]eriodic reviews" and to keep the records "current," "accessible," and "readily available for review." *Id.* r. 64B8-9.013(3)(f). The jury could find, based on the testimony and Dr. Germeil's own files, that she did not conduct complete physical examinations or keep accurate and complete patient records.

Further, a jury may reasonably conclude that a defendant distributed prescriptions without a legitimate medical purpose and outside the usual course of professional practice when four indicators are present: (1) an unusually high number of prescriptions corresponding to an unusually high number of opioids, (2) an absence of physical examinations, (3) prescriptions written to patients who the prescribing practitioner knows are giving the drugs to other people, and (4) the lack of a relationship between the drugs prescribed and the treatment of the medical condition responsible for the pain symptoms. *See Joseph*, 709 F.3d at 1104. All four indicators were present here.

First, the jury had Ms. Carter and Dr. Hoch's testimony about the large numbers of prescriptions and pills—as well as the actual prescriptions that Dr. Germeil wrote to the undercover officers, confidential sources, and ten other patients, as described by Agent Grafenstein. *See United States v. Ignasiak*, 667 F.3d 1217, 1227–29 (11th Cir. 2012) (finding "evidence that [the defendant] had written more than [forty-three thousand] prescriptions for controlled substances over a five year period" sufficient, when combined with expert testimony, to support that he "prescribed unnecessary or excessive quantities of controlled substances without a legitimate medical purpose and outside the usual course of professional practice" (internal quotation marks omitted)).

Second, according to Agent Grafenstein, Dr. Germeil admitted to skipping physical examinations at times, and both

confidential sources testified to receiving prescriptions from her without first having examinations. Also, the evidence showed that when Dr. Germeil did conduct examinations, they were too cursory to comply with the standard of medical care. Dr. Germeil told Agent Grafenstein that she limited her examination of a patient to touching the area in which the patient claimed pain. The undercover officers and Mr. Morales Gomez corroborated that, give or take a quick listen to their breathing with a stethoscope, their examinations entailed only Dr. Germeil touching the complained-of area. The jury could find that Dr. Germeil's examinations did not comply with the Florida regulation governing pain prescription standards. *See* R. 64B8-9.013(3)(a). Dr. Hoch also testified to this effect.

Third, Officer Guell and the confidential sources provided evidence that Dr. Germeil prescribed opioids to patients even after she knew—because they told her—that they gave the opioids to other people. Officer Guell told Dr. Germeil that he shared Oxycodone pills with his sister, and then she prescribed him more Oxycodone. Mr. Morales Gomez told her he sold his prescription medications to help family in Cuba, and then she wrote him another prescription. And, as discussed, Dr. Germeil knew that Ms. Hernandez sold pills because Ms. Hernandez told her and because Dr. Germeil's patient file for Ms. Hernandez noted the sharing of the Oxycodone pills.

Fourth, the government introduced evidence that Dr. Germeil was not interested in treating medical conditions at all, just in prescribing pain pills.  Dr. Germeil told Agent Grafenstein that her focus was on writing opioid prescriptions rather than recommending other pain therapies.  And, contrary to what her patient files said, the undercover officers and confidential sources stated that, during their brief visits with her, Dr. Germeil did not discuss other treatments such as diet and exercise, did not prioritize follow-up appointments or at-home safety, and did not advise them to seek emergency services or hospitalization if their pain continued.  Evidence also supported that the officers and sources had no medical conditions requiring pain medication when Dr. Germeil wrote them prescriptions.  Officer Guell's magnetic resonance imaging results showed no need for treatment, Agent Maxey identified his pain level at a three and told Dr. Germeil that his back did not hurt when she pushed on it, Mr. Morales Gomez cited "discomfort" rather than pain as his reason for seeing Dr. Germeil and left a spot on a form blank because he "had no pain," and Ms. Hernandez left her pain level blank on her form and had no pain and no injury when Dr. Germeil prescribed her pain pills.

Given the overwhelming evidence presented against Dr. Germeil at trial, we have no difficulty finding that sufficient evidence supported her drug convictions.  The jury could reasonably construe the evidence to find Dr. Germeil guilty beyond a reasonable doubt.  *See Azmat*, 805 F.3d at 1035.

### Reasonableness of the Sentence

Dr. Germeil maintains that the district court imposed an unreasonable sentence using an incorrect drug quantity based on irrelevant conduct involving uncharged prescriptions about which the jury made no findings. She "was sentenced based upon unreliable and over inclusive information that the [g]overnment . . . conceded . . . may be inaccurate," she claims, and "was penalized twice by her failure to appear at sentencing" because the district court believed her flight "alone warranted denial" of her request for a lower sentence.

The district court made a *Keene* finding, affirming that it would've imposed the same sentence even if the guidelines had been miscalculated. "Under our precedent, we need not review a sentencing issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." *United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022) (cleaned up) (citing *Keene*, 470 F.3d at 1349–50). When "a district court states that the sentence it has imposed would not have changed even with a different guideline calculation[,] we assume there was an error, reduce the guideline range according to the way the defendant argued, and analyze whether the sentence would be substantively reasonable under that guideline range." *Id.* (citing *Keene*, 470 F.3d at 1349–50). "The defendant has the burden of proving that his sentence is

unreasonable in light of the record and [18 U.S.C. section] 3553(a)."
*Id.* (cleaned up).

Dr. Germeil argued that the district court should only consider the eleven office visits of conviction for purposes of drug quantity, yielding a base offense level of twenty-four. Adding the enhancements (which Dr. Germeil doesn't appeal) equals a total offense level of thirty-one, and after factoring in her criminal history category of I, we arrive at a guideline range of 108 to 135 months' imprisonment. Thus, to determine whether Dr. Germeil's sentence was unreasonable under *Keene*, we assume her guideline range was 108 to 135 months' imprisonment and ask whether her total sentence of 210 months was substantively reasonable under section 3553(a). *Id.* at 19.

We decide "whether [a] sentence is substantively reasonable under the totality of the circumstances." *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). A defendant's sentence must "adequately (1) 'reflect the seriousness of the offense,' (2) 'promote respect for the law,' (3) 'provide just punishment,' (4) 'afford adequate deterrence,' (5) 'protect the public from further crimes of the defendant,' and (6) provide the defendant with any needed training and treatment in the most effective manner." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253–54 (11th Cir. 2015) (quoting 18 U.S.C. § 3553(a)(2)).

Determining a sentence is "a holistic endeavor." *Id.* at 1254. "To arrive at an appropriate sentence, the district court must

consider all of the applicable [section] 3553(a) factors": "the nature and circumstances of the offense," "the defendant's history and characteristics," "the kinds of sentences available," "the applicable sentencing guidelines range," "pertinent policy statements of the Sentencing Commission," "the need to provide restitution to any victims," and "the need to avoid unwarranted sentencing disparities." *Id.* (citing 18 U.S.C. § 3553(a)). But "[t]he decision about how much weight to assign a particular sentencing factor is committed to the sound discretion of the district court." *Id.* (quotation omitted). A district court "abuses its considerable discretion and imposes a substantively unreasonable sentence only when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* at 1256 (quotation omitted). "Because that rarely happens, it is only the rare sentence that will be substantively unreasonable." *Id.* (quotation omitted).

"Additionally, although the district court has discretion to impose a sentence outside of the guideline range, a major variance requires a more significant justification than a minor one." *Grushko*, 50 F.4th at 20. But "we do not presume that a sentence outside of the guideline range is unreasonable and give deference to the district court's decision that the [section] 3553(a) factors support its chosen sentence. Further, a sentence imposed below the

statutory maximum penalty is an indicator of a reasonable sentence." *Id.*

Looking at the record as a whole, Dr. Germeil hasn't shown that her total sentence is substantively unreasonable. Indeed, the district court had significant justification for the sentence it imposed. Dr. Germeil was convicted of prescribing opioids without medical necessity eleven times, of failing to appear at her sentence hearing, and of being in contempt of court. These offenses are serious ones. *See* 18 U.S.C. § 3553(a)(1)–(2) (nature and circumstances of the offense, the need to reflect the seriousness of the offense). The drug convictions show that Dr. Germeil posed a recurring danger to her community, and the other counts show her lack of respect for the justice system. Although she did not have a criminal history, she has a history of refusing to accept responsibility for her actions, as seen in her attempts to shift the blame to her husband and in her fugitive flight from the country between conviction and sentencing. *See id.* (need to promote respect for the law, characteristics of the defendant, provide just punishment, deter criminal conduct, and protect the public). And contrary to Dr. Germeil's contention, the record shows that the district weighed her flight as just one factor, among many others, in deciding a 210-month sentence was justified.

Regarding the sentences available, the statutory maximum term of imprisonment for each of the eleven drug convictions was 240 months, *see* 21 U.S.C. § 841(b)(1)(C); the maximum for the

failure to appear was 120 months, *see* 18 U.S.C. § 3146(b)(1)(A)(i), to run consecutively to the drug sentence, *see id.* § 3146(b)(2); and punishment for contempt of court was left to the district court's discretion, *see id.* § 401(3); *United States v. Cohn*, 586 F.3d 844, 849 (11th Cir. 2009) (describing contempt of court as a unique offense for which a "wide range of sentences . . . may be imposed"). Dr. Germeil's 188-month sentence for her conviction under § 841(b)(1)(C) was below the statutory maximum of 240 months, and her 22-month sentence under § 3146(b)(1)(A)(i) was below the statutory maximum of 120 months. *Grushko*, 50 F.4th at 20 ("[A] sentence imposed below the statutory maximum penalty is an indicator of a reasonable sentence.").

Under the totality of these circumstances, Dr. Germeil's sentence is not the "rare" substantively unreasonable one. *See Rosales-Bruno*, 789 F.3d at 1256. Thus, even if we assume that the district court erred in calculating drug quantity, that error is harmless under *Keene*.

## CONCLUSION

In sum, we discern no abuse of discretion in the district court's admission of Dr. Hoch's opinion testimony nor its refusal to give a "good faith" jury instruction. We find that the district court properly denied the motion for judgment of acquittal and that the jury had more than enough evidence to support Dr. Germeil's drug convictions. And we conclude that the district court

19-14942              Opinion of the Court                    39
19-14961

properly exercised its discretion to impose a reasonable sentence under the totality of the circumstances.

**AFFIRMED.**